UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

IMMANUEL LLC,                                 Case No. DT 10-11585
                                              Chapter 11
        Debtor.                               Hon. Scott W. Dales
_____/

OPINION AND ORDER REGARDING MOTION OF IMMANUEL, LLC
FOR VALUATION OF PROPERTY AND RELATED MATTERS

PRESENT:     HONORABLE SCOTT W. DALES
             United States Bankruptcy Judge

## I. INTRODUCTION

Immanuel, LLC (the "Debtor") is family-run real estate holding company located in Traverse City, Michigan that experienced financial reversals when the real estate market in Northern Michigan and throughout the country collapsed. The company, which depended upon capital contributions from its members to fund its limited operations and service its debts, found itself unable to meet its obligations after its members declined to make further contributions. Facing foreclosure, the Debtor filed a voluntary petition for relief under Chapter 11 on September 24, 2010 (the "Petition Date").

Within a month after the Petition Date, the Debtor filed a proposed Combined Chapter 11 Disclosure Statement and Plan of Reorganization (as amended, the "Plan," DN 27 & 49). Because the Plan contemplates transferring some portion of the Debtor's real estate holdings to its two secured creditors, the Debtor promptly filed a motion for valuation of property pursuant to Fed. R. Bankr. P. 3012 (the "Valuation Motion," DN 42) so the court could value the property

that the Debtor proposes to transfer.  By order dated December 16, 2010, the court approved the parties' expedited discovery plan and scheduled an early hearing on the Valuation Motion.

Two weeks later, the Debtor's largest creditor, the Oleson Foundation ("Oleson"), filed its motion to dismiss or convert (the "Dismissal/Conversion Motion," DN 65).  The Debtor's second largest secured creditor, Northwestern Bank ("Northwestern"),[1] supports Oleson's Dismissal/Conversion Motion.

On February 16, 2011, the court held a hearing on the Dismissal/Conversion Motion -- one week before the valuation hearing was scheduled to begin.  Because the question of the Debtor's equity in the Secured Creditors' collateral was central not only to the Plan confirmation, but also to the Secured Creditors' request to dismiss or convert, the court postponed ruling on the Dismissal/Conversion Motion in order to resolve the Valuation Motion first. On February 22 through February 24, 2011, the court held a hearing principally to consider the value of the Secured Creditors' collateral pursuant to Fed. R. Bankr. P. 3012, but also to consider the Dismissal/Conversion Motion.

The Debtor asked the court to conduct a valuation hearing in contemplation of confirmation.  The Debtor characterized the Plan as a partial "dirt for debt" plan pursuant to which the Debtor proposes to surrender some portion of its real estate -- the "dirt" -- to retire its loans -- the debt.  Oleson's collateral consists of a single parcel of approximately 200 acres in Garfield Township (the "Oleson Collateral"), within Grand Traverse County. The Debtor's Plan proposes to satisfy Oleson's claim in full by surrendering some portion of the Oleson Collateral, depending upon the court's conclusions of value. *See* Plan at § 3.2. The Northwestern Collateral,

---

[1] In this Opinion, the court will refer to Oleson and Northwestern collectively as the "Secured Creditors."

on the other hand, consists of 23 separate parcels of undeveloped land in the East Bay Township section of Grand Traverse County (the "Northwestern Collateral"). The Debtor proposes to surrender all of the Northwestern Collateral.[2]

As the plan proponent, the Debtor bears the burden of establishing value by a preponderance of the evidence.  *See In re Wcislak*, 417 B.R. 24, 28 (Bankr. N.D. Ohio 2009) (*citing In re Finnegan*, 358 B.R. 644, 649 (Bankr. M.D. Pa. 2006)); *see also* 4 Collier on Bankruptcy ¶ 506.03[9] at 506-94.1 (15th ed. rev.) (burden of proof for a valuation proceeding depends on the circumstances … and in the plan confirmation context, the proponent bears the burden of establishing that the plan meets all the requirements of section 1129(a) and (b)).

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052 and 9014(c).  As explained below, the Debtor has failed to persuade the court to accept its view of the Secured Creditors' collateral.

## II. JURISDICTION

The Debtor filed a voluntary petition with this court under Chapter 11 on September 24, 2010, commencing a "case" pursuant to 11 U.S.C. § 301, and creating a bankruptcy estate under 11 U.S.C. § 541(a).  The United States District Court for the Western District of Michigan has jurisdiction over the Debtor's case, and all property of the estate, pursuant to 28 U.S.C. § 1334(a) and (e), but has referred the case and its original jurisdiction to this court pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a).

---

[2] *See* Plan at §§ 1.27 and 3.1. Although the Plan contemplates that Northwestern might assert a deficiency claim by challenging the Debtor's value of the Northwestern Collateral, the Plan as presently drafted does not expressly provide for such a deficiency claim. During closing argument, the Debtor's counsel explained that the Debtor was not proposing to eliminate Northwestern's deficiency claim, and that the Debtor would deed additional unencumbered property to Northwestern as necessary to pay the claim in full.

This proceeding to determine the value of estate property in connection with Chapter 11 plan confirmation falls within the court's core jurisdiction under 28 U.S.C. § 157(b)(2)(B) and (L).   Accordingly, the court has full authority to resolve the issues, subject to the parties' appellate rights under 28 U.S.C. § 158.

### III. ANALYSIS

A. <u>Valuation in General</u>

Bankruptcy courts are often called upon to determine value for many reasons, and at different stages within a proceeding. *See* Fed. R. Bankr. P. 3012; 11 U.S.C. § 506(a). Recognizing the pervasive influence of valuation decisions and the myriad ways in which valuation questions may arise, Congress has given the courts considerable flexibility in determining value, along with some direction.  For example, where, as here, a court is required to determine a creditor's secured status, the Code provides as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . .  is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

11 U.S.C. § 506(a)(1) (emphasis added).   Here, the Debtor has asked the court to value the Northwestern and Oleson Collateral in connection with the Debtor's proposed Plan.  Implicit in conducting such a valuation hearing, the court will necessarily determine the extent of each creditor's interest in their respective collateral. *Id*.; Fed. R. Bankr. P. 3012. In making its determination, the court is mindful that the Debtor is not liquidating property, but is instead

transferring property to the Secured Creditors, giving them deeds *in lieu* of foreclosure. *See* Plan at §§ 3.1 & 3.2.

Other courts confronting "dirt for debt" plans have adopted a "fair market value" determination for the surrendered collateral, and have made deductions where there is only partial surrender of collateral and the plan proponent attempts to "cram down" the plan under 11 U.S.C. § 1129(b). This approach endeavors to ensure that secured creditors receive the "indubitable equivalent" of their secured claims. The parties have addressed much of their efforts to the issues involving such a discounting, and during closing argument the court asked them to amplify their arguments in this regard. Some courts have observed that creditors who receive all of their collateral necessarily receive the indubitable equivalent of their "secured claim." *In re Bannerman Holdings, LLC*, 2010 WL 4260003 slip. op. (Bankr. E.D. N.C. Oct. 20, 2010) (*citing In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989)).  Depending upon the circumstances, however, some courts seem to permit the secured creditor to further discount the value of surrendered collateral to take into account the time and expense involved in reducing that collateral to cash through sale or other liquidation. As explained below, the court need not reach that issue until confirmation.

B. <u>The Northwestern Collateral</u>

The Debtor offered no appraiser or appraisal evidence regarding the value of the Northwestern Collateral, relying instead upon (1) the 2010 State Equalized Value (the "SEV") and (2) the supposed admissions about "loan to value" contained within Northwestern's loan file.

In Michigan, a tax assessor's determination of SEV is a convenient and familiar shorthand measure of real estate values.  Bankruptcy practitioners, especially those involved in

automatic stay litigation or in preparing schedules, frequently refer to "two times SEV" to establish value. This formula comes from Michigan's *ad valorem* real estate property taxation scheme which directs tax assessors to identify "true cash value" for parcels of taxable property within their respective jurisdictions, and defines "assessed value" as one-half of "true cash value." *See* M.C.L. § 205.737.

In order to equalize assessed values from township to township within a particular county and to avoid disparity in property taxation, the statute provides for an "equalization" review by the county and also by the state. *See* M.C.L. § 211.34; *id.* § 209.4. The Grand Traverse County equalization director and East Bay Township assessor, Lori Spencer, credibly testified that if she has done her job in identifying "true cash value," the assessed value should equal one-half of the true cash value, and there should be no need for any of the reviewing authorities to apply an equalization or adjustment factor. In such a case, the assessed value equals the SEV. In the present case, the evidence established that the SEV for the Northwestern Collateral is $2,540,000.00.

In theory, doubling the SEV can produce a useful approximation of value, as Oleson's real estate director, Jack Smith, readily conceded at trial, but the court hesitates to rely on this figure to establish the fair market value of the Northwestern Collateral. As Ms. Spencer explained, the 2010 SEV is actually an estimate of value as of December 31, 2009, based upon information not specific to any particular piece of property, and on data available, at the latest, on October 1, 2009. In other words, the 2010 SEV represents values from almost a year and a half ago, and the Debtor is asking the court to use this outdated and non-specific information to establish the value of the Northwestern Collateral in March 2011. The court declines to do this because the SEV process lacks sensitivity to current market factors and specific property

characteristics, and presents an unacceptable risk of imprecision. Indeed, Northwestern's appraiser, Glenn R. Gotshall, testified without objection that in the Traverse City area, based upon his recent research comparing SEVs with actual sale prices, simply doubling the SEV produced consistently higher opinions of value than actual arms length sale prices would support. In fact, he opined that value based upon doubling an SEV should be discounted by at least 41% to arrive at an accurate estimate. The court credits this testimony.

An appraisal, in contrast, is the product of an expert's current and property-specific investigation, interviews, and research, generally rendered after walking the specific property and touring the immediate neighborhood. Although the Debtor did not offer an appraisal of the Northwestern Collateral, Northwestern did, in the form of Exhibits NW1-5, which Mr. Gotshall prepared and explained after careful investigation and study.

Mr. Gotshall and his appraisal held-up well under the Debtor's thorough cross-examination, and the court finds him to be the most reliable of the appraisers who testified. In his testimony, Mr. Gotshall explained how he evaluated the specific parcels of property, and grouped them separately in clusters of adjacent parcels to facilitate his appraisal. The groupings were reasonably supported by his experience in this particular market, by location, and by topographical characteristics. Mr. Gotshall employed the sales comparison approach to valuation, the appraisal method enjoying the greatest consensus among the testifying appraisers, for undeveloped land in the current Traverse City market. His comparables were, generally speaking, analogous to his subjects, and though the comparables warranted some adjustments, they nevertheless struck the court as a reasonable foundation for his conclusion. The court is willing to use the sum of the grouped parcels to determine value for all the Northwestern

Collateral because, unlike the Oleson Collateral, the parcels are not contiguous, nor could they be sold as one unit, and because Mr. Gotshall testified in support of this conclusion.

Although, as the Debtor points out, Mr. Gotshall did not use several sales of portions of the subject property as comparables (such as the McCallister, Hilbert, or Watkins sales), the court concludes that the various idiosyncrasies with respect to each of these transactions undermined their reliability and justified Mr. Gotshall in not including them.[3] In any event, even a skillful cross-examination of Mr. Gotshall, such as that undertaken by Debtor's counsel, is not a substitute for specific and reliable evidence of value, particularly considering that the burden of proof lies with the Debtor as plan proponent.

The Debtor attempted to make much of the fact that, as late as June 2010, in Northwestern's internal memos prepared by its Rule 30(b)(6) witness, William Green, Northwestern expressed no concern about its loan to value ratio, suggesting that the creditor believed it was over-secured. *See* Debtor's Exh. VV and XX. In essence, the Debtor relies upon its lender's supposed opinion of value and prepetition complacency to establish that Northwestern is over-secured. The court is not persuaded.

First, Mr. Green explained that he premised his loan-to-value observations on the original appraisal prepared in 2002. There is a consensus among all the witnesses that the market has declined substantially since that time. Second, to the extent Mr. Green's annual loan review memos are evidence of value, it is opinion evidence from a witness who was not qualified as an

---

[3] The McAllister property involved the sale of .9 acres that the McAllisters had inadvertently cleared to build a house and was in settlement of their liability for committing waste on the property; the Hilbert property was sold for $186,000.00 and was the sale of 8.9 acres with a house and two outbuildings to someone who wanted to repurchase his family's homestead; and the Watkins sale of $120,000.00 took place in 2009 and involved 1.6 acres with an older house and pole barn.

expert, and is not the owner of the property.[4]  It is equally possible that Mr. Green was inattentive to this ratio due to his reliance on a long-standing relationship with one of the region's largest landholding families and the family's willingness to grant additional collateral from time to time. In any event, as between the credible evidence from Mr. Gotshall, a qualified expert, and the perfunctory annual file review memoranda from Mr. Green, the court finds the former considerably more reliable and persuasive.

On this record, the court accepts Mr. Gotshall's appraisal and finds that Northwestern's collateral has a fair market value of $2,386,000.00. Because the evidence established that Northwestern has a claim in the amount of $3,748,590.00 as of the Petition Date, the court concludes that Northwestern is undersecured to the extent of $1,362,590.00.  Because the Plan, at least as presently drafted, proposes to surrender all of Northwestern's collateral, it seems plausible to conclude that Northwestern is receiving the indubitable equivalent of its secured claim.[5]  Nevertheless, the Debtor's Plan will have to provide for the resulting deficiency claim: surrendering collateral in full satisfaction will not meet the Bankruptcy Code's confirmation standards because Northwestern has a secured claim and an unsecured claim.

Finally, the court declines Northwestern's request to further discount the value at this time by taking into account the costs and delays associated with liquidating the collateral. Such adjustments may be necessary -- at confirmation -- to ensure that the Plan is "fair and equitable"

---

[4] Federal courts have historically permitted landowners to give their opinions about the value of their property, but such opinions are not necessarily entitled to great weight. *See* Barry Russell, Bankruptcy Evidence Manual § 701:2 (2009-2010 ed.).  The court is not inclined to extend this historical practice to loan officers under the circumstances presented here.

[5] The Bankruptcy Code divides the claims of secured creditors into a secured portion, and an unsecured portion, depending upon the value of the collateral and the amount of the debt.  *See* 11 U.S.C. § 506(a). With respect to the secured portion of a creditor's claim, some courts have held that a debtor who surrenders all of the creditor's collateral pursuant to a reorganization plan will always be providing the indubitable equivalent of the secured portion of the claim. *In re Bannerman Holdings, LLC*, 2010 WL 4260003 slip. op. (Bankr. E.D. N.C. Oct. 20, 2010) (*citing In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989)).

to Northwestern, should the court be required to consider the "cram down" provisions of Chapter 11. *See* 11 U.S.C. § 1129(b)(2)(A)(iii). However, because the court does not accept the Debtor's value of the Northwestern Collateral the Plan as presently proposed is a dead letter, and it seems unwise to render an opinion determining whether it provides the indubitable equivalent of any secured claim before the court is required to make such a ruling.[6]

C. The Oleson Collateral

Valuing the Oleson Collateral is considerably more complicated than valuing the Northwestern Collateral, not only because the Debtor offered an appraisal for the Oleson Collateral, but also given the nature of the property.

The testimony established that the Oleson Collateral is the largest single tract of undeveloped land in close proximity to downtown Traverse City and, by several accounts, the likely location of Traverse City's next large-scale commercial development -- when the real estate market recovers. Testimony from Cori Nielson (the manager of the Debtor's manager, Waypoint Management, LLC), and Jack Smith, Oleson's real estate director, as well as documentary evidence including the loan documents, established that the Debtor, or its predecessor in interest,[7] purchased the Oleson Collateral from Oleson in 2002 for $11,000,000.00. Oleson provided seller financing by accepting $2,200,000.00 as a down payment and a promissory note in the amount of $8,800,000.00. *See* Debtor's Exh. L

---

[6] Accordingly, the court will take judicial notice of the state and county transfer taxes submitted by Northwestern, but does not need to consider their effect upon the valuation calculation in the present motion.

[7] For convenience, the court will refer to the Debtor as having purchased the property, though the record is somewhat unclear about the exact identity of the purchaser. Mr. Smith said that Generations Management, LLC purchased the property, but the note and mortgage list Granite Acquisitions, LLC as the obligor and mortgagor, respectively. The 2010 Notice of Assessment from Garfield Township lists Granite Acquisitions, LLC and Canyon Holdings, LLC, as the owner. The Pelegrin Appraisal notes that Granite Acquisitions, LLC purchased the property before being merged into the Debtor. *See* Debtor's Exh. A. The exact identity of the purchaser is immaterial to the court's conclusions about value.

(Promissory Note dated Jan. 25, 2002). According to Mr. Smith, there was virtually no negotiation -- he named the price and the Debtor accepted. As mortgagee of the Oleson Collateral, Oleson has a claim against the Debtor in the amount of $7,829,658.00 as of the Petition Date.

Even though the Oleson Collateral has unique potential, the size and location of the property has hampered the Debtor's efforts to sell it because, as several witnesses explained, there are not many prospective buyers in the presently-distressed real estate market who could finance and develop such a large parcel. Indeed, this fact has prompted the Debtor to obtain conditional approval to subdivide the single parcel into eighteen smaller units, on the theory that smaller parcels would attract more buyers. The conditions attached to the split-approval, however, further complicate the court's valuation task.

Ms. Nielson, a licensed real estate broker, explained that large commercial properties such as the Oleson Collateral may be sold in smaller parcels as if the property had been formally divided, but offering property for sale in this manner, without formal subdivision, confuses potential buyers. She explained that buyers want to know exactly where the splits are -- *i.e.*, the precise extent of the land they may be purchasing. Ms. Nielson and her brother-in-law, Jonathan Crosby, the other family member in charge of the Debtor's real estate holdings, both testified that they believed dividing the Oleson Collateral in this way would facilitate sales. Indeed, when the Debtor retained its appraiser, Jeffrey Pelegrin, they asked him to prepare an appraisal of the eighteen separate parcels, which he endeavored to do. *See* Debtor's Exh. A (the "Pelegrin Appraisal").

The first premise of the Pelegrin Appraisal is that the parcel splits have been conditionally approved, and "it is assumed that access roads will be constructed in the time allotted or an extension will be granted." *See id.* at p.6. The court has difficulty accepting this premise for several reasons.

First, although the Debtor's representatives testified about the importance to their marketing efforts of dividing the Oleson Collateral into smaller units, the Debtor only recently applied for the division, a mere four days before the Petition Date.  If this subdivision were truly important to the Debtor's marketing efforts over the last eight years, one would have expected it to seek approval much earlier.  This delay raises questions about the purposes of the attempted split.

Second, the record establishes that Garfield Township conditionally approved the Debtor's proposed land division on November 10, 2010, and again on February 9, 2011.  *See* Debtor's Exh. J & RR.   The initial approval lapsed by its terms on or about February 7, 2011 because the Debtor failed to comply with all conditions within the 90 day period, specifically the construction of a quarter mile service drive along a major thoroughfare, US-31/M37.  Two days after the initial approval lapsed, the Debtor again obtained approval, on the same conditions, including construction of the service drive by May 27, 2011. Even accepting, *arguendo*, the Debtor's premise that splitting the property will meaningfully affect the value, the court notes that the Debtor permitted the initial approval to lapse on February 6, 2011 by failing to install the road.  In fairness, the Debtor's witnesses testified that it is more prudent to construct a road in the spring rather than winter, but when the court asked who would be paying for construction, Ms. Nielson responded vaguely that the Debtor's members would do so to protect their "equity" in the Oleson Collateral.  On this crucial point, the Debtor should have offered testimony from the

interest holders establishing that they were ready, willing, and able to contribute. The absence of such testimony is telling, given Ms. Nielson's prior testimony that the Debtor's cash flow depends entirely upon capital calls to equity participants, and that these same participants could no longer justify making contributions to service the Debtor's debts to Oleson and Northwestern.

Moreover, although the court credits the testimony that winter may not be an ideal time to install a road, winter weather would not prevent the Debtor from soliciting bids or gathering basic information about the costs, particularly given the importance of the road to the Debtor's vision for the property, and the central role the subdivision played in the Pelegrin Appraisal and the Plan. Yet, neither Ms. Nielson nor Mr. Crosby had any specific information about the timing, the expense, or the funding of construction.

In considering the weight to accord the Pelegrin Appraisal, the court agrees that Mr. Pelegrin and his firm bring impressive credentials to the table, but notes that Mr. Pelegrin himself has never appraised any real estate in Traverse City, or even Michigan, until undertaking this assignment. The court does not mean to suggest that the fundamentals of the appraiser's craft are inherently local. Indeed, evidence established the existence of uniform appraisal standards, presumably applicable nationwide. Nevertheless, the appraisers who testified each noted that, in performing the sales comparison approach, it is necessary to make adjustments to the comparables, and that these adjustments, to a considerable extent, depend upon the appraiser's judgment. Such judgment-calls are simply more reliable when the appraiser is familiar with the local market, as Messrs. Gotshall, Whiting, Tarnow, and Coddington are.

With respect to Mr. Pelegrin's comparables, his choices (especially for Parcels 4 and 17) raise concerns about how directly or closely he was involved in preparing his report. For

example, in appraising Parcel 4 and Parcel 17 within the Oleson Collateral, he used 3380 Hartman Road, Garfield Township, as two of his five comparables.  As Comparable Sale No. 1, he includes the recent "listing" of 3380 Hartman Road, with an asking price of $1,450,000.00. This is a "bank listing" in which a lender is endeavoring to dispose of foreclosed property. Although it is natural to assume that the listing seller consulted a realtor in setting a price, the court cannot ignore the possibility that an institutional lender may have different incentives in disposing of property than other possible sellers. Elsewhere in his testimony, he conceded that listings are less reliable comparables than closed sales, so he made a downward adjustment to reflect the fact that the "seller" would probably not get the asking price.  In a troubling admission on cross-examination, however, Mr. Pelegrin conceded that his file notes reflected that the property sold for $250,000 two months before his deposition, even though this fact was not reflected in the appraisal or any update.  Comparable Sale No. 2 is a foreclosure sale, and several witnesses credibly testified that such distressed sales make unreliable comparables. Mr. Pelegrin admitted on cross-examination that Parcels 4 and 17 account for nearly $3,000,000.00 of the Oleson Collateral, a significant portion of the property.

Finally, assuming, *arguendo*, that dividing the appraisal assignment into eighteen separate appraisals is appropriate, the court is left to speculate about what the Pelegrin Appraisal actually means.  On the one hand, Mr. Pelegrin opines that the highest and best use for the Oleson Collateral is to hold the entire parcel for future development, but on the other hand, the premise of his appraisal is that the property should be split up for current sale. In splitting the property, it appears that Mr. Pelegrin undertook an income approach or subdivision development approach to appraisal, but abandoned that approach midway through the process.  He explained that he was unable to adopt the income approach because of a lack of trustworthy data and

because of the relatively unsophisticated nature of the real estate market in Traverse City. Although the Debtor's counsel had no difficulty advocating that the court should simply add up the various values for each of the eighteen parcels to arrive at the total value of the 200 acres, Mr. Pelegrin himself was utterly unwilling to countenance that approach. His appraisal identifies this as a limitation and warns readers not to do so. Consistent with this admonition, his testimony was scrupulously vague in response to questions about the propriety of such an aggregation of values. He indicated, as he had in prior testimony, that the value of the entire parcel may be more, less, or the same as the sum of the eighteen splits. His testimony created the impression that he was uncomfortable with the appraisal assignment and, frankly, the resulting appraisal.

The valuation hearing took place under the rubric of 11 U.S.C. § 506(a), and the court feels constrained to determine the extent of the Oleson Foundation's secured claim and unsecured claim, if any. But, because the Pelegrin Appraisal and Mr. Pelegrin's accompanying testimony asserted values for the property as split into eighteen parcels, while carefully avoiding any statements concerning the value of the property as a whole, the court has no basis to make this determination based upon this appraisal -- it is singularly unhelpful.[8] Therefore, the court rejects it as incomplete and unreliable evidence regarding the value of the Oleson Collateral.

The only other evidence of value the Debtor offered in its case in chief was the SEV that the Garfield Township Assessor, James Chrestensen, assigned to the Oleson Collateral: a 2010 SEV of $6,131,000.00 which, by doubling, suggests a true cash value of $12,262,000.00. Mr. Chrestensen testified that the assessed value his office assigned to the Oleson Collateral is the product of a "mass appraisal" rather than a "fee appraisal," generally not dependent upon the specific property to which the assessor must, as a statutory matter, assign value. Although the

---

[8] The court assumes that Mr. Pelegrin properly refrained from offering such an opinion because of doubts about the data supporting it, including doubts about any aggregation premium or the effect of putting eighteen parcels on the market at the same time.

system of annual mass appraisals may be well-suited to an *ad valorem* tax program in arriving at fair valuation over extended periods of time, it does not lend itself to establish valuation in the "dirt for debt" confirmation context where so much depends upon the court's valuation decision. *See In re Bannerman Holdings, LLC,* 2010 WL 4260003 slip. op. (Bankr. E.D.N.C. Oct. 20, 2010) (*citing In re Simons*, 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990) *and In re Atlanta S. Business Park, Ltd.*, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994)). As discussed in these cases, courts must take a conservative approach to valuation in the "dirt for debt" context.

Like the East Bay Township Assessor, Mr. Chrestensen described the process pursuant to which the assessor's office endeavors to determine "true cash value" within the meaning of M.C.L. § 205.737.  As with the Northwestern Collateral, the court discounts the weight and reliance the Debtor places on the SEV as evidence of value. Indeed, the Debtor's appraiser agreed that sometimes SEV is a good indicator of value, and sometimes it is not.  Moreover, comments made by Mr. Chrestensen as to the role he was playing in valuing this specific piece of property at trial suggest that even he harbored doubts about the efficacy of a mass appraisal in identifying value for the purposes of 11 U.S.C. § 506(a).  Just like the Debtor's use of the SEV in valuing the Northwestern Collateral, using the SEV to value the Oleson Collateral is undependable and not sufficiently property-specific.  Moreover, because the court credits Mr. Gotshall's testimony about the disparity between actual sales prices and SEVs in his recent experience, the court would be constrained to reduce the assessor's estimate of true cash value by at least 41%, which suggests a value of approximately $7.2 million -- still below Oleson's claim.

In sum, the court finds the Debtor's evidence of the Oleson Collateral's value to be unreliable and an unacceptable premise for assigning value to any of its constituent sub-parcels. The court also notes that every testifying appraiser, without exception, found that holding the

entire property for future development was its highest and best use, yet the Debtor is asking the court to abandon the only unanimous finding by the appraisers and value the property as if split into eighteen parcels and promptly sold.

The Oleson Foundation also offered expert appraisal testimony regarding the value of its collateral in the form of testimony and reports from Michael Tarnow, Jeffrey Whiting, and Daniel Coddington.  Each of these appraisers drew valid criticisms of their work on cross examination, further complicating the court's task in resolving the Valuation Motion.  The court notes, however, that unlike Mr. Pelegrin, Mr. Tarnow, Mr. Whiting and Mr. Coddington are intimately familiar with the Traverse City real estate market and this familiarity adds weight to their opinions.

With respect to Mr. Tarnow and his appraisal report, however, the court is constrained to reject it for several reasons.  First, as Mr. Gotshall observed, the appraised value that Mr. Tarnow assigned to the Oleson Collateral is a striking departure not only from the Debtor's assigned value but from the values given by the other two appraisers and the tax assessor (even as discounted). This disparity is perhaps due to the fact that Mr. Tarnow adopted an appraisal method – the income approach – that each of the other three appraisers rejected.[9]

In addition to the court's concerns about the consensus of the other appraisers, the magnitude of the difference between Mr. Tarnow's value and the values the other witnesses assigned strikes the court as remarkable and significant. The Tarnow Appraisal appears to be an outlier, and the court discounts it heavily.

On the other hand, the court accepts the Whiting and Coddington Appraisals, but notes that they each suffer from their own problems, mostly due to a lack of high quality comparables.

---

[9] In each case, the appraisers rejected the approach because of their conclusions that data for the Traverse City marketplace, particularly data affecting the discount factors, was either non-existent or otherwise unreliable.

Both appraisers used the sales comparison approach and both agreed that holding the Oleson Collateral for future development was its highest and best use. Mr. Coddington prepared four appraisals for the Oleson Collateral. Initially, at the Debtor's direction, he appraised the property as a whole and determined the value to be $6,579,810.00. *See* Exh. O6. Next, also at the Debtor's instruction, he appraised the property in 3 separate parcels – the back 44 acres, zoned residential; the middle 120 acres, zoned mixed use commercial without road frontage; and the front 38 acres, zoned commercial with road frontage. Splitting the property in this way yielded an increased appraised value of $8,200,000.00. *See* Exh. O7. The Debtor, apparently still not satisfied, indicated it wanted a third appraisal, which Mr. Coddington did not do because it was beyond the scope of his ability as a certified residential real estate appraiser.

Mr. Coddington's comparables in the appraisals included a resort;[10] a high end mixed residential/commercial development with views of Grand Traverse Bay, and better proximity to downtown Traverse City than the Oleson Collateral; and property that was developed by a retail home improvement store as an end-user. Mr. Coddington acknowledged that there was a lack of comparables due to the uniqueness of the property and the dearth of property sales in the area.

Mr. Whiting completed his appraisal at the request of the Oleson Foundation. Having been told that it was strictly for internal use and not for a court hearing, his appraisal is admittedly less careful than it ought to have been, given the purposes for which Oleson offers it. Regardless, Mr. Whiting testified that whatever mistakes he may have made did not affect his opinion of value.

Mr. Whiting appraised the property as one 200 acre parcel with a market value of $7,300,000.00. Because of the lack of nearby comparables, Mr. Whiting expanded his search all

---

[10] The court takes judicial notice of the zoning ordinance of Elmwood Township where this comparable was situated.

the way to the Muskegon area (approximately 150 miles to the South)[11] where he found a large parcel of land recently sold, that was close to The Lakes Mall, a Meijer store, and had frontage on Interstate 96.   His other comparables included two 25 acre sites in a commercial/light industrial business park known as Chums Village; an 89 acre rural parcel about one mile from Turtle Creek Casino; and a 225 acre parcel, zoned residential, in a suburban area.

Although not perfect, the Coddington and Whiting appraisals used the correct valuation approach – sales comparison -- and arrived at roughly similar conclusions and values. Consequently, the court will adopt each of these appraisals, though relying more heavily on Mr. Coddington than Mr. Whiting, given the court's view of their respective comparables and the fact that Mr. Coddington prepared his appraisals at the Debtor's behest.

In her closing argument, Debtor's counsel advocated an approach to valuation not supported by the record which started with the Debtor's $11,000,000.00 purchase price in 2002, and adjusted the price upwards or downwards depending upon the market adjustments reflected in the appraisals.   In effect, counsel urged the court to consider the 2002 sale of the Oleson Collateral as its own comparable.

There are several problems with this approach.   First, none of the appraisers advocated it, presumably because it does not comport with any of the three recognized valuation methods: the cost approach, the sales comparison approach, or the income approach. Second, even putting aside the circularity of using the subject property as a comparable,[12] the sale upon which the analysis depends occurred nine years ago. The expert testimony confirmed that the Traverse City market and the national economy have changed dramatically since 2002, with precipitous

---

[11] *See* Exh. O8, at p.42. The distance and differences between the Traverse City and Muskegon markets make it difficult to regard the Muskegon transaction as "comparable."

[12] The court agrees with Mr. Tarnow that using the 2002 sale of the Oleson Property is not only unwise because of the inherent circularity, but also because of the remoteness in time of that transaction to the Valuation Hearing.

declines in 2008-09, and recent, creeping improvement thereafter. Third, this eleventh hour theory has a questionable premise: that the Debtor paid a reasonable price for the property to begin with. This premise is flawed in view of Mr. Smith's credible testimony that the Debtor and its affiliates routinely overpay for real estate, and that the Debtor accepted his asking price in 2002 without meaningful negotiation.[13] Indeed, the relative lack of real estate experience of the Debtor's two in-house witnesses, Ms. Nielson and Mr. Crosby, tends to support Mr. Smith's observations. Ms. Nielson, though licensed as a real estate sales person since 2002, was directly involved in only three to four transactions in her career; her brother-in-law, Mr. Crosby, could recall only eighteen real estate sales transactions in which he has been involved during the eleven years that have elapsed since he became licensed as a real estate professional in 2000. The evidence established that these two individuals are largely responsible for the Debtor's real estate decisions, including the unsuccessful marketing of the properties over the last eight years. Their experience and track record, combined with other factors including remoteness in time, make the court hesitate to accept the 2002 acquisition as a comparable sale.

For all these reasons, the court finds that the Oleson Collateral has a fair market value of $6,900,000.00. The court reaches this number by comparing the Coddington Appraisal that values the property as a whole ($6,579,810.00), the Whiting Appraisal ($7,300,000.00), and discounting the "true cash value" implicit in the 2010 SEV that Mr. Chrestensen offered in recognition of Mr. Gotshall's credible testimony.

---

[13] Mr. Smith has a long history with the Traverse City real estate market during his tenure with Oleson and its related entities. His testimony suggests extensive experience in developing commercial property throughout Northern Michigan, which made him aware of many transactions, including those involving the Debtor and its affiliates.

D. <u>The Dismissal/Conversion Motion</u>

Having determined the value of the Secured Creditors' collateral, the court must next consider the Dismissal/Conversion Motion, including the alternative request for relief from the automatic stay.

At the initial hearing to consider these matters on February 16, 2011, the Debtor persuaded the court that the valuation decision would play a central role in resolving the Dismissal/Conversion Motion and nearly every aspect of the parties' dispute. Indeed, the court relied on the imminent valuation hearing as special circumstances excusing compliance with the fifteen day deadline prescribed in 11 U.S.C. § 1112(b)(3), further illustrating the centrality of value to the various issues before the court.

For example, although the Secured Creditors argued that there was no reasonable prospect for reorganization, a valuation decision in the Debtor's favor might have answered that criticism, given the "dirt for debt" nature of the Plan as presently proposed. Similarly, an equity cushion (if the court accepted the Debtor's valuation) might have defeated Oleson's alternative request for relief from the automatic stay.

For its part, Northwestern has consistently argued that cause to dismiss or convert exists in part because the Debtor effected fraudulent transfers which Northwestern hopes to avoid and recover either in this court (using derivative standing or through a Chapter 7 trustee), or directly in state court (invoking the Uniform Fraudulent Transfer Act). To these charges, the Debtor responded that avoidance actions would be fruitless either because the Debtor was solvent at the time of the transfers, or because there could be no benefit to a solvent bankruptcy estate (given the Debtor's view of value), and therefore no possible recovery under the Bankruptcy Code. *See,*

*generally,* 11 U.S.C. §§ 548 and 550; M.C.L. § 566.31 *et seq.* The court notes that in Northwestern Bank's Supplemental Memorandum of Law (DN 151), Northwestern refers to a series of warranty deeds -- all recorded within one year before the Petition Date -- that it intends to introduce into evidence at a further evidentiary hearing.

From these examples, the court has no difficulty concluding that its determination of value will profoundly affect the outcome of this case. Rather than conduct that evidentiary or further hearing on the Dismissal/Conversion Motion at the court's next motion day, however, the court has instead scheduled a status conference to take place March 16, 2011 in Traverse City, Michigan at 1:30 p.m. At that status conference, the court will hear from the parties about the best way to ensure that they all have a full and fair opportunity to consider the effect of the court's valuation decision on the pending requests for relief, and more generally, the path of this case.

NOW, THEREFORE, IT IS HEREBY ORDERED that the parties shall appear at a status conference on March 16, 2011, at 1:30 p.m., at the United States Bankruptcy Courthouse, Logan Place West, 3249 Racquet Club Drive, Traverse City, Michigan, and be prepared to discuss the effect of this Opinion on the Dismissal/Conversion Motion and the future course of these proceedings.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion upon Tamar N. Dolcourt, Esq., Judy O'Neill, Esq., Michael I. Conlon, Esq., Kent E. Gerberding, Esq., Frederick R. Bimber, Esq., William V. Calcutt, Esq., Michelle M. Wilson, Esq., and all ECF registered users in this case, pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: March 14, 2011**